**Edith M. RICKARD, Plaintiff**

v.

**TEYNOR'S HOMES, INC.
et al, Defendants**

No. 3:03CV7018.

United States District Court,
N.D. Ohio,
Western Division.

Aug. 25, 2003.

M. Angela Foraker, Twyman, Ten Brink, Harms & Sharp, Bowling Green, OH, Jeanne D. Johns, Advocates for Basic Legal Equality, Toledo, OH, for Edith M. Rickard, Plaintiff.

John Tarkowsky, Baran Piper Tarkowsky Fitzgerald & Theis, Mansfield, OH, for Teynor's Homes, Inc.

Damian M. Rodgers, Robert J. Gilmer, Jr., Eastman & Smith, Toledo, OH, for Fairmont Homes, Inc.

## ORDER

CARR, District Judge.

This suit arises from the sale of a manufactured home by defendant Teynor's Homes, Inc. ("Teynor's") to plaintiff Edith M. Rickard. Plaintiff has also sued Fairmont Homes, Inc. ("Fairmont"), the home's manufacturer, and American Modern Home Insurance Company. Pending is Teynor's motion to dismiss or stay litigation and compel arbitration. This court has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1367. For the following reasons, Teynor's motion to stay shall be denied.

## BACKGROUND

In October, 1997, plaintiff and her late husband, Norman E. Rickard, entered into a contract to purchase a Fairmont modular home from Teynor's. In February, 1998, Teynor's delivered the home to plaintiff's place of residence in Cygnet, Ohio.

Plaintiff claims the house was negligently installed, and, after set up, the home began to "substantially deteriorate." First Amended Complt. at ¶ ¶ 22, 26. According to plaintiff, the problems with the house, "as designed and constructed, pose a structural danger to the house and further danger to the occupants of the house." *Id.* at 38. Plaintiff also claims that defendants conspired to breach their warranty obli-

gations "through unlawful denials of claims, and fraudulent misrepresentations as to the terms and conditions of the warranties." *Id.* at 39.

Plaintiff's First Amended Complaint asserts eight causes of action, including breach of express and implied warranties, failure to warn of a defective product, breach of contract, civil conspiracy, fraud, unconscionability, and violations of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01 *et seq.* and the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq. Id.* at ¶¶ 30–52.

Teynor's moves to dismiss or, in the alternative, to stay litigation and compel arbitration in reliance on the "Addendum to Sales Agreement/Consent to Binding Arbitration" ("Addendum"), signed by the Rickards. Under the terms of the Addendum, the Rickards voluntarily waived their ability to bring any cause of action in any court arising out of the sales transaction.

Plaintiff claims that the arbitration agreement is unenforceable because:

(1) there is no meeting of the minds or voluntary and mutual assent between the Rickards and Teynor to create a valid arbitration agreement; (2) the making of the Addendum to Sales Agreement/Consent to Binding Arbitration is unconscionable due to adhesion and unequal bargaining power between the parties; (3) the terms of the Addendum, regarding the rules of arbitration are unconscionable and inherently unfair to Mrs. Rickard and do not prove an adequate or accessible forum for her to redress her grievances; (4) the Magnuson–Moss Warranty Act provides that consumers retain full and unfettered access to the courts for resolution of their warranty disputes. And, the Addendum violates and destroys the purpose and

intent of the Magnuson–Moss Warranty Act.

Doc. 23 at 10.

## DISCUSSION

### I. Federal Arbitration Policy

Through the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, Congress has declared a national policy favoring arbitration. *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). The FAA's purpose is "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Accordingly, "the [FAA] establishes that, as a matter of Federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Notwithstanding this policy, "arbitration is a matter of contract and a party cannot be required to submit to arbitration [in] any dispute which he has not agreed so to submit." *AT&T Techs. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Under § 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

When considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks:

first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether

Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. J.D. Byrider,* 228 F.3d 709, 714 (6th Cir.2000).

"In determining whether the parties have made a valid arbitration agreement, 'state law may be applied *if* that law arose to govern issues concerning the validity, revocability, and enforceability' of contracts generally, although the FAA preempts 'state laws applicable to *only* arbitration provisions.'" *Great Earth Cos. v. Simons,* 288 F.3d 878, 889 (6th Cir.2002) (quoting *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)). Thus, "[s]tate law governs 'generally applicable contract defenses [to an arbitration clause], such as fraud, duress, or unconscionability.'" *Id.* at 889 (quoting *Casarotto,* 517 U.S. at 687, 116 S.Ct. 1652).

█ In this case, the question whether the Addendum is an enforceable arbitration agreement is resolved by basic, generally applicable precepts of Ohio contract law. However, the federal policy favoring arbitration is taken into consideration even in applying ordinary state law. *Inland Bulk Transfer Co. v. Cummins Engine Co.,* 332 F.3d 1007, 1014 (6th Cir.2003) (quoting *Great Earth,* 288 F.3d at 887).[1] Whether Congress intended claims under the MMWA to be nonarbitrable is resolved by federal law.

## I. Mutual Assent

Plaintiff argues the arbitration agreement is not enforceable because the Rickards did not voluntarily and mutually agree to arbitrate any dispute. Plaintiff contends that because the Addendum provides that disputes shall be resolved through "arbitration pursuant to the rules of the American Arbitration Association" ("AAA") and plaintiff did not receive a copy of the AAA rules, she did not have basic information regarding the arbitration process at the time of assent. Doc. 23 at 4–5. Teynor's did not, according to plaintiff, "equip the Rickards with the necessary information to knowingly surrender their right to hold Teynor accountable in a court of law." Doc. 23 at 4–5. The arbitration agreement is unenforceable, therefore, because there was no meeting of the minds. *Id.*

█ Under Ohio law and the FAA, arbitration cannot be forced on parties who do not consent to it. *See Volt Info. Sciences, Inc. v. Bd. of Trs.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (stating that "the FAA does not require parties to arbitrate when they have not agreed to do so"); *Sweeney v. Grange Mut. Cas. Co.,* 146 Ohio App.3d 380, 766 N.E.2d 212 (2001) (noting that "'arbitration is a matter of contract and, in spite of the strong policy in its favor, a party cannot be compelled to arbitrate any dispute which he has not agreed to submit'") (citation omitted).

█ The law is equally clear, however, that a plaintiff cannot be excused from complying with an arbitration agreement if he or she simply fails properly to read the contract. *See ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 692 N.E.2d 574 (1998)

---

1. The court in *Great Earth* noted that "although state law may dictate the standards for generally applicable contract defenses, such as fraudulent inducement, the FAA governs the enforceability of arbitration clauses generally ... and expresses a 'liberal federal policy favoring arbitration agreements' that must be taken into account even when state-law issues are presented." 288 F.3d at 887 (citations omitted).

("'A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.'") (citation omitted).

Similarly, under general contract law, "'one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions.'" *Inland Bulk,* 332 F.3d at 1007 (citing *Stout,* 228 F.3d at 715). As the court noted in *Pippin v. M.A. Hauser Enters., Inc.* 111 Ohio App.3d 557, 564, 676 N.E.2d 932 (1996), "[a] person who signs a contract without making a reasonable effort to know its contents cannot, in the absence of fraud or mutual mistake, avoid the effect of the contract." This rule is applicable even in cases where the person seeks to avoid the effect of the contract "by citing ignorance of the contract's contents or a failure to understand those contents." *Id.* (citations omitted).

The Sixth Circuit recently rejected an identical mutual assent defense in a federal employment dispute with similar facts. In *Haskins v. Prudential Ins. Co. of Am.,* 230 F.3d 231 (6th Cir.2000), the plaintiff, when he signed his employment application, agreed to arbitrate any dispute with his employer according to the National Association of Securities Dealers ("NASD") Code. *Id.* at 232. After his termination, plaintiff brought a civil action against his former employer for race and age discrimination. His former employer moved to compel arbitration, arguing that the NASD Code required arbitration of any employment claim. The plaintiff countered that because he was not given a copy of the NASD Code and no agent of his employer familiarized him with the NASD Code, he should not be compelled to arbitrate. *Id.* at 233–234.

The Sixth Circuit disagreed, concluding that a party to a contract is chargeable with the knowledge of its terms. *Id.* at 239. The court explained:

[I]gnorance as to the terms of the [application] is no defense. Because Haskins signed the [application], which informed him that he would be bound by the NASD rules requiring him to arbitrate his claims arising out of termination of his employment, and because there has been no showing of fraud, duress, mistake, or some other ground upon which a contract may be voided, Haskins is required to arbitrate his claims.

*Id.* at 241.

■ In light of *Haskins,* plaintiff cannot argue that she did not consent to arbitration because she was not provided a copy of the AAA rules or that Teynor's did not explain the AAA rules to her. Ignorance of the contents of the Addendum is no defense.

## II. Unconscionability

Plaintiff argues that the Addendum is unconscionable "due to adhesion and unequal bargaining power between the parties." Doc. 23 at 6. Plaintiff describes herself and her late husband as "poorly educated and unsophisticated consumers" who were living in the garage of their condemned house. *Id.* at 7. Mr. Rickard allegedly suffered from severe heart disease, hypertension, fibromyalgia, chronic anxiety, depression, and was an insulin dependent diabetic. *Id.* at 2. The disparity in bargaining power, plaintiff argues, denied the Rickards a meaningful choice in accepting the terms of the Addendum. Plaintiff also alleges that the Rickards were presented with the arbitration agreement in a "take-it or leave it fashion" and not given an opportunity to take it with them to review. They were therefore unable to engage in any meaningful negotiation of its terms. *Id.* at 6–7.

Plaintiff also argues that the Addendum's arbitration procedures fail to pro-

vide an adequate or accessible forum for redressing grievances. Doc. 23 at 7. Plaintiff alleges that she is a "senior citizen who lives on a fixed income," and the costs associated with arbitration would be an "extreme hardship." *Id.* Because she cannot afford arbitration, plaintiff claims the Addendum is "prohibitive" and unconscionable, and, therefore, unenforceable.

 Under Ohio law, a contract clause is unconscionable where one party has been misled as to its meaning, where a severe imbalance of bargaining power exists, or where the specific contractual clause is outrageous. *Cross v. Carnes,* 132 Ohio App.3d 157, 170, 724 N.E.2d 828 (1998) (citing *Orlett v. Suburban Propane,* 54 Ohio App.3d 127, 129, 561 N.E.2d 1066 (1989)). Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party. *Collins v. Click Camera & Video, Inc.,* 86 Ohio App.3d 826, 834, 621 N.E.2d 1294 (1993).

The unconscionability doctrine embodies, therefore, two separate components: "(1) substantive unconscionability, *i.e.,* unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.,* individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Jeffrey Mining Prods. L.P. v. Left Fork Mining Co.,* 143 Ohio App.3d 708, 758 N.E.2d 1173 (2001). Under Ohio law, "*[b]oth* elements must be present to find a contract unconscionable." *Id.* (emphasis added).

**A. Procedural Unconscionability**

In determining procedural unconscionability, Ohio courts looks to "factors bearing

on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Cross v. Carnes,* 132 Ohio App.3d 157, 170, 724 N.E.2d 828 (1998). "The crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print ...?'" *Ohio Univ. Bd. of Trs. v. Smith,* 132 Ohio App.3d 211, 724 N.E.2d 1155, (1999).

 Plaintiff has a strong argument that the Addendum is procedurally unconscionable. She provides evidence that Teynor's would not have sold the home if plaintiff had not signed the standardized forms and Addendum. A distinctive feature of an adhesion contract is that the weaker party has no realistic choice as to its terms. Moreover, the more standardized the agreement and the less a party may bargain meaningfully, the more susceptible the contract will be to a claim of procedural unconscionability.

**III. Substantive Unconscionability: Prohibitively Expensive**

The Addendum does not include any information on the costs of arbitration or how the costs are apportioned between parties. The agreement simply references the AAA rules. The fees under the AAA's Commercial Arbitration Rules include administrative filing fees, compensation for the arbitrator, and general expenses for the arbitration.[2]

 Under current law, there is no clear standard to determine if or when

**2.** Plaintiff attaches random pages of "AAA rules" to her brief in opposition to defendant's motion to stay, but she does not clarify which set or version of AAA rules she is referencing. The AAA has different sets of

arbitration can be so cost prohibitive for a consumer seeking to resolve a dispute with a business that the arbitration agreement becomes unenforceable.[3]

When federal rights are at issue, the Supreme Court has recognized that "the existence of large arbitration costs could preclude a litigant ... from effectively vindicating her federal statutory rights in the arbitral forum." *Green*

*Tree Financial Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). The Court went on to hold, though, that "where ... a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92, 121 S.Ct. 513.[4]

The Court in *Green Tree* did not, however, provide a standard for determining how

arbitration rules depending on the area of law.

The Addendum simply states that "any and all controversies ... shall be resolved by arbitration pursuant to the rules of the American Arbitration Association ...." Doc. 15 at Ex. 1. Because plaintiff is a consumer and the parties have not specified, I assume that the AAA's Commercial Arbitration Rules, as amended January 1, 2003, apply to the Addendum.

3. The Supreme Court and the Sixth Circuit have recognized a "prohibitive cost" defense to arbitration of federal statutory claims. *See Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000); *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646 (6th Cir.2003). Lower courts are divided whether this defense should be analyzed in terms of unconscionability. *Cf Ting v. AT&T,* 182 F.Supp.2d 902, 933 (N.D.Cal.2002) (using substantive unconscionability) *with Camacho v. Holiday Homes, Inc.,* 167 F.Supp.2d 892 (W.D.Va.2001) (viewing the defense as one standing alone and apart from unconscionability analysis).

I agree with the court in *Ting,* "[i]t is hard to conceive of how an adhesive contractual provision which prevents someone from effectively vindicating her non-statutory legal rights would not be substantively unconscionable." 182 F.Supp.2d at 933. I will, therefore, apply the same substantive unconscionability analysis to both statutory and non-statutory claims.

4. In *Green Tree,* the Court addressed "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." 531 U.S. at 82, 121 S.Ct. 513. The plaintiff argued that her arbitration agreement was not enforceable because its silence with respect to costs and fees created a risk

that the plaintiff would be required to bear prohibitive arbitration costs. Because of the potentially substantial arbitration costs, plaintiff argued that she would be forced to forgo her claims, and therefore be unable to vindicate her federal statutory rights. 531 U.S. at 90, 121 S.Ct. 513.

Although the Court acknowledged that substantial arbitration costs could be prohibitively expensive, the record in the plaintiff's case, did not demonstrate that the plaintiff would bear such costs if she went to arbitration. The risk that the plaintiff would be saddled with prohibitive costs was "too speculative to justify the invalidation of an arbitration agreement." *Id.*

The Sixth Circuit has recently summarized the following propositions of law that can be derived from *Green Tree:*

First, in some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum. Under *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the arbitral forum must provide litigants with an effective substitute for the judicial forum; if the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum. Second, where that prospect deters potential litigants, the arbitration agreement, or, at minimum, the cost-splitting provision contained within it, is unenforceable under *Gilmer.* Third, the burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 659–660 (6th Cir.2003).

detailed the showing of prohibitive expenses must be to find an arbitration agreement unenforceable. The Sixth Circuit, in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir.2003), created its own test, concluding:

> [I]f the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute. In conducting the analysis, the reviewing court should define the class of such similarly situated potential litigants by job description and socioeconomic background. It should take the actual plaintiff's income and resources as representative of this larger class's ability to shoulder the costs of arbitration.

*Id.* at 663.[5]

Ohio courts have also recently analyzed whether arbitration costs are so prohibitive to make an arbitration agreement unconscionable. *See e.g., O'Donoghue v. Smythe, Cramer Co.*, 2002 WL 1454074, *4, 2002 Ohio App. LEXIS 3571, at *14, 15 (Jul. 3, 2002) (finding that the arbitration clause "deprive[d] the appellees an adequate remedy" because it "effectively ... denied any redress."); *Garcia v. Wayne Homes, LLC*, 2002 WL 628619, 2002 Ohio App. LEXIS 1917 (Apr. 19, 2002).

In *Garcia*, the plaintiffs, in arguing that the arbitration costs violated fundamental concepts of equity and fairness, provided an AAA cost schedule that would require plaintiffs to pay a non-refundable fee of $1,250, a potentially refundable service fee of $750, and an arbitrator's fee of $750. 2002 WL 628619, *13, 2002 Ohio App. LEXIS 1917 at *49. The court, nonetheless, concluded that "proof of costs alone, will not invalidate an arbitration clause." *Id.* Because the plaintiffs did not produce evidence of the expected cost differential between arbitration and litigation in court, the plaintiffs "failed to produce sufficient facts or allegations ... that the undisclosed costs of arbitration rendered the provision unconscionable." *Id.*, 2002 WL 628619, *13, 2002 Ohio App. LEXIS 1917, at *50.

Plaintiff in this case has likewise failed to produce sufficient facts or allegations to find that the Addendum is unenforceable as prohibitively expensive. Under *Green Tree* and *Morrison*, plaintiff has the burden of producing such information.

Plaintiff only speculates that, under the AAA rules, she would have to pay an initial $750 filing fee and $750 per day for an in person arbitrator fee. Doc. 23 at 8. She then concludes: "Contrast the cost of arbi-

---

**5.** In *Morrison*, applicants for employment with Circuit City were required, as a condition of employment, to sign arbitration agreements that required all arbitrations to proceed according to the Circuit City Dispute Resolution Rules and Procedures. 317 F.3d at 654. Under the rules, an employee had to pay a filing fee of $75. Circuit City would thereafter advance all the costs for the arbitration, but each party would be required to pay one-half of the costs of arbitration following the issuance of an arbitration award. *Id.* at 654–55.

The court found the cost-splitting provision of Circuit City's rules unenforceable, concluding:

> Morrison cited a recent estimate by the AAA that the average arbitrator fee was $700 per day and that an average employment case incurred a total of $ 3,750 to $ 14,000 in arbitration expenses. Based on these considerations, along with the evidence that Morrison presented regarding her previous salary, we conclude that the default cost-splitting rule in the Circuit City arbitration agreement would deter a substantial percentage of potential litigants from bringing their claims in the arbitral forum.

*Id.* at 669.

tration with the fact that her filing fee was deferred in this lawsuit and it is clear that the cost of arbitration is prohibitive and is not an adequate forum for Mrs. Rickard to redress her grievances." *Id.*[6]

The AAA has an Administrative Fee Waiver/Deferral/Hardship Provision that provides: "In cases where an AAA administrative fee applies, parties are eligible for consideration for a waiver or deferral of the administration fee if their annual gross income falls below 200% of the federal poverty guidelines."

Because plaintiff has provided no evidence of her income or her ability (or inability) to pay the costs of arbitration, it is unclear whether she would qualify for the waiver. Moreover, because plaintiff has not provided any income information, she has not demonstrated that the AAA rules deter a substantial number of similarly situated persons from attempting to vindicate their statutory rights—as required by *Morrison.*

Thus, plaintiff insinuates that the fees and costs she may have to pay for arbitra-tion could effectively deny her access to the arbitral forum, but she has not provided any factual basis for such an assertion. Under *Green Tree, Morrison,* and the Ohio cases, such a showing is essential to plaintiff's argument.

■ If plaintiff had provided a detailed showing of the administrative and arbitrator's fees and other costs involved in the arbitral forum, as well as a personal financial record reflecting her inability to pay those costs, I would be more likely to find that such a consumer would be precluded from vindicating her rights.[7] Because plaintiff has not provided such information, however, I cannot presently conclude that this arbitration agreement is unenforceable under Ohio contract law principles.

Plaintiff will, however, be granted leave to demonstrate that, given her financial condition and the terms of this the Addendum, she has, if compelled to engage in arbitration in lieu of this suit, no redress for the vindication of her legal rights and this arbitration agreement is unconscionable.[8]

---

6. Under the AAA's Commercial Arbitration Rules, as amended January 1, 2003, the claimant must pay a $ 750 filing fee. *See* R–51 Administrative Fees. The other expenses of the arbitration shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties. *See* R–52. Expenses. The parties also must make a deposit of $750 per day for an in person hearing. For a complete copy of the Commercial Rules of Arbitration, as amended January 1, 2003, and the other versions of the Commercial Rules of Arbitration, see *www.adr.org/.*

7. *Cf. Camacho,* 167 F.Supp.2d at 896 (finding that the plaintiff "successfully demonstrated that the arbitration clause precludes her from effectively vindicating the rights afforded her by the [Truth In Lending Act] because the arbitral forum is financially inaccessible to her"). In *Camacho,* the plaintiff filed a "declaration of her financial condition" indicating her family's monthly income, expenses, and overall debt. *Id.* at 894–94. *See also Phillips v. Assocs. Home Equity Servs., Inc.,* 179 F.Supp.2d 840, 847 (N.D.Ill.2001) (finding that the plaintiff "carried her burden of proving that the costs associated with arbitration would effectively preclude her from vindicating her federal statutory rights"); *Mendez v. Palm Harbor Homes,* 111 Wash.App. 446, 45 P.3d 594 (2002) (finding plaintiff had "met his burden to show prohibitive costs").

8. Because of the possibility that plaintiff may have no recourse to vindicate her legal rights, it is fair to grant plaintiff leave to produce the required information. If arbitration is supposed to allow litigants to avoid the formalities, expense, and delays inherent in the court system, its underlying policies will be defeated when arbitration agreements trigger costs depriving plaintiffs of a forum to vindicate their rights. As the court in *Mendez v. Palm Harbor Homes,* recently explained:

Avoiding the public court system to save time and money is a laudable societal goal.

## IV. Magnuson–Moss

Plaintiff argues that the MMWA is a congressionally approved exception to the FAA. According to plaintiff, the Act's language, regulations, and legislative history confirm that Congress intended the consumer to retain full and unfettered access to the courts for resolution of their disputes. Doc. 23 at 9. Granting Teynor's motion, according to plaintiff, would rob her of "access to a court of law to redress her warranty grievance and would render her rights under the Magnuson–Moss Warranty Act meaningless." *Id.*

Even though the MMWA does not require manufacturers or sellers to provide warranties, the MMWA creates specific duties and liabilities for manufacturers that choose to do so. *See* 16 C.F.R. § 700.3. The purpose of the MMWA is to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products ..." 15 U.S.C. § 2302(a).

In order to advance these goals, § 2310(d) provides a statutory private right of action to consumers "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter or under a writ-ten warranty, implied warranty, or service contract ...." § 2310(d)(1). Consumers are permitted to recover reasonably-incurred costs and expenses, including attorneys' fees, if they prevail in such suits. § 2310(d)(2).

To encourage settlements by means other than civil lawsuits, the MMWA allows a warrantor to include a provision for "informal dispute settlement procedures" for breach of written warranty claims and to require consumers to resort to such procedures before bringing a civil action. § 2310(a). The term "informal dispute settlement procedure" is not defined anywhere in the text of the Act. The Federal Trade Commission (the "FTC"), however, is instructed to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty." § 2310(a)(2).

The FTC has adopted a regulation that precludes informal dispute settlement procedures under the MMWA from being legally binding. 16 C.F.R. § 703.5(j) ("Decisions of the Mechanism shall not be legally binding on any person."). Thus, the FTC—the agency to which Congress entrusted the task of implementing and elaborating the provisions of the MMWA—

---

But avoiding the public court system in a way that effectively denies citizens access to resolving everyday societal disputes is unconscionable. Goals favoring arbitration of civil disputes must not be used to work oppression. When the goals given in support of contract clauses like this are used as a sword to strike down access to justice instead of as a shield against prohibitive costs, we must defer to the overriding principle of access to justice.
45 P.3d at 605.
As explained, *infra*, this reasoning is especially applicable to claims under the MMWA. The MMWA was passed with the purpose of improving the adequacy of information to consumers and preventing consumer deception. Congress's overall goal in the Act is to protect consumers from unfair written warranties. By requiring consumers to absorb the costs of arbitration, arbitration provisions incorporating the rules of the AAA may undermine the statutory policy of the MMWA, thereby depriving a consumer of meaningful relief to his or her MMWA claims. Thus, similar to mandatory arbitration for employees, mandatory arbitration for consumers could be unfair to those consumers who cannot afford to arbitrate because it may also lock them out of the judicial process, leaving them unable to seek any, much less meaningful redress for their injuries. To permit such circumstances to exist would eviscerate the statutes which Congress enacted, at least in part, because injured citizens had no place else to turn for relief.

interprets the MMWA to preclude the enforcement of binding arbitration clauses in written warranties. *See* 40 Fed.Reg. 60168, 60211 (1975) ("There is nothing in the Rule which precludes the use of any other remedies by the parties following a Mechanism decision ... However, reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act.").[9]

Under *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), courts are bound to defer to an agency's interpretation of an Act unless 1) Congress has "directly spoken to the precise question at issue," or 2) the agency's construction of the statute is unreasonable.

The text of the MMWA contains no language explicitly indicating whether Congress intended to preclude application of the FAA to breach of written warranty claims brought under the MMWA.[10] There is, therefore, no basis to conclude that Congress has "directly spoken to the precise question at issue."[11]

Because Congress has "delegated authority to the agency generally to make rules carrying the force of law," *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), courts are required to defer to the FTC's construction of the statute unless that in-

---

**9.** Despite the FTC regulations, numerous courts—including the only two federal appellate courts to have addressed the issue—have concluded that, in light of the FAA's liberal policy in favor of arbitration, the MMWA permits binding arbitration. *See e.g., Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir.2002); *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470 (5th Cir.2002); *Southern Energy Homes, Inc. v. Ard*, 772 So.2d 1131 (Ala.2000); *In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 44 Tex. Sup.Ct. J 815 (Tex.2001); *Results Oriented Inc. v. Crawford*, 245 Ga.App. 432, 538 S.E.2d 73 (Ga.Ct.App.2000).

Other federal and state courts have relied on the FTC regulations—at least partially—to conclude that the MMWA precludes binding arbitration. *See e.g., Browne v. Kline Tysons Imports, Inc.*, 190 F.Supp.2d 827 (E.D.Va. 2002); *Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F.Supp.2d 958 (W.D.Va.2000); *Rhode v. E & T Invs., Inc.*, 6 F.Supp.2d 1322 (M.D.Ala.1998); *Boyd v. Homes of Legend*, 981 F.Supp. 1423 (M.D.Ala.1997); *Wilson v. Waverlee Homes, Inc.*, 954 F.Supp. 1530 (M.D.Ala.1997); *Parkerson v. Smith*, 817 So.2d 529 (Miss.2002); *Borowiec v. Gateway 2000, Inc.*, 331 Ill.App.3d 842, 265 Ill.Dec. 218, 772 N.E.2d 256 (2002).

**10.** As Chief Judge King explains in his dissent in *Walton*,

The absence of such explicit language is not particularly surprising. At the time of the MMWA's passage, the FAA was not under-

stood to be as broadly applicable as it is today. The Act was widely thought to be inapplicable to claims based on assertions of statutory rights (as opposed to purely contractual claims). In the early 1980's, however, the Supreme Court clarified (and, arguably, expanded) the scope of the FAA in a number of ways. *See* Katherine Van Wezel Stone, *Rustic Justice; Community and Coercion under the Federal Arbitration Act*, 77 N.C. L.Rev. 931, 943–54 (1999) (detailing the history of the Court's increasingly expansive interpretation of the FAA's jurisdictional and substantive applicability). Under this modern reading of the FAA, the presumption of enforceability "is not diminished when a party bound by an agreement raises a claim founded on a statutory right."

298 F.3d at 481 n. 20 (King, J. dissenting) (citations omitted).

**11.** *Cf. Browne*, 190 F.Supp.2d at 832 (finding that "[a] clear reading of the statute evinces Congress' intent to encourage informal dispute settlement mechanisms, yet not deprive any party of their right to have their written warranty dispute adjudicated in a judicial forum"); *Waverlee Homes, Inc.*, 954 F.Supp. at 1538 (holding that intent of the MMWA with respect to written warranties is that consumers are to retain full and unfettered access to courts for resolution of their disputes).

terpretation is unreasonable. *Chevron,* 467 U.S. at 843 n. 25, 104 S.Ct. 2778.

As Chief Judge King explained in his dissent in *Walton,* the FTC based its determination that Congress intended to preclude enforcement of binding arbitration clauses in written warranties on two factors: 1) the FTC's reading of a staff report of the House Interstate and Foreign Commerce Committee's Subcommittee on Commerce and Finance; and 2) the Commission's concern that such arbitration provisions would inadequately protect the interests of consumers. 298 F.3d at 486 (King, J. dissenting).

■ For the reasons expressed by Judge King in his *Walton* dissent, I conclude that the FTC's expressed rationales for its interpretation of the MMWA indicate that the FTC's reading is based on a reasonable construction of the statute. *Id.* at 487–92. I will, therefore, defer to the FTC's expertise and interpretation of the statute. Thus, the MMWA precludes enforcement of binding arbitration agreements for claims under a written warranty.

There are, however, additional reasons why the FTC regulations should be entitled to deference. The federal policy favoring arbitration should give way to the pro-consumer policy embodied in the MMWA. The creators of the FAA understood that arbitration agreements historically were entered into in the commercial or contractual context where the parties were sophisticated and deliberately desired to avoid the expense and delay attendant on the civil trial system.[12] That policy does not acknowledge the practical circumstances of cases such as this, where the principal consequence of the "agreement" to arbitrate is to deprive the plaintiff of her right to judicial resolution of the dispute, and thus, of meaningful opportunity for redress. Therefore, notwithstanding the Supreme Court's recent expansion of the FAA, the statute's "liberal policy" should not encroach on or undermine the manifest pro-consumer policy of the MMWA.

Because the provision of the MMWA governing informal dispute settlement procedures is applicable only to claims brought pursuant to written warranties, plaintiff's claims under the MMWA, with respect to written warranties, are not subject to binding arbitration. *See e.g., Walton,* 298 F.3d at 475 (citing 15 U.S.C. § 2310(a)(2) ("The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a *written* warranty to which any provision of this chapter applies.")) (emphasis added).

Accordingly, to the extent plaintiff's MMWA claim relates to breach of Teynor's written warranty, Teynor's motion to

---

12. *See e.g.,* Larry J. Pittman, *The Federal Arbitration Act: The Supreme Court's Erroneous Statutory Interpretation, Stare Decisis, and a Proposal for Change* 53 Ala. L.Rev. 789, 829 (2002) (finding that the drafters and supporters of the FAA envisioned that "the FAA should apply only to arbitration agreements between merchants who have freely entered into such agreements, and that the FAA does not apply to adhesion arbitration agreements between powerful sellers and weak buyers"); Sen. Russell D. Feingold, *Policy Essay: Mandatory Arbitration: What Process is Due?* 39 Harv. J. on Legis. 281, 289 (stating that Congress did not originally intend "the FAA to enable stronger parties to force weaker parties into binding arbitration"); Jean R. Sternlight, *Panacea or Corporate Tool? Debunking the Supreme Court's Preference for Binding Arbitration* 74 Wash. U.L.Q. 637, 647 (1996) ("Most commentators have concluded that the FAA was envisioned as applying to consensual transactions between two merchants of roughly equal bargaining power, and not necessarily to transactions between a large merchant and a much weaker and less knowledgeable consumer.").

dismiss or stay litigation of this claim is denied.

## CONCLUSION

Teynor's motion to stay is denied with respect to plaintiff's claims under the MMWA for breach of written warranties. Plaintiff is granted to leave to demonstrate that the arbitral forum will not afford the opportunity to vindicate her legal rights.

It is therefore,

**Ordered that**

1. Leave be, and it hereby is granted to plaintiff to supplement her opposition to the defendant's motion to stay and compel arbitration with information regarding her financial circumstances and resources, and the likely costs to her of being allowed to pursue this litigation or being compelled to arbitrate her claims; said supplementation and further briefing to be filed by September 15, 2003; defendant granted leave to respond thereto by September 30, 2003; and

**2. Defendant's motion to stay litigation and compel arbitration be, and hereby is, denied as to plaintiff's claims under the MMWA with respect to written warranties.**

**So ordered.**