919 A.2d 722

**KOONS FORD OF BALTIMORE, INC.**

v.

**Raymond Calvin LOBACH, et al.**

No. 66, Sept. Term, 2006.

Court of Appeals of Maryland.

March 20, 2007.

Ryan R. Dietrich (Thomas M. Wood, IV of Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. of Baltimore), on brief, for appellant.

C. Sukari Hardnett (Law Office of C. Sukari Hardnett of Silver Spring), on brief, for appellees.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This case is an appeal from the Circuit Court for Baltimore County. William and Raymond Lobach purchased a vehicle from Koons Ford of Baltimore, Inc. ("Koons Ford") and, after discovering defects in that vehicle, filed a complaint against

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Koons Ford in the Circuit Court, alleging, *inter alia*, that Koons Ford violated the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq. Koons Ford contends that the claim must be submitted to binding arbitration because, as part of the purchase, William and Raymond signed a buyer's order that contained a binding arbitration clause, and arbitration is expressly favored by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et. seq. Raymond argues that the MMWA prohibits the forced resolution of claims through binding arbitration, and, therefore, the FAA does not apply. He also claims that the arbitration clause must be included in the warranty document to be enforceable under the single document rule.

We conclude that, under the MMWA, claimants may not be forced to resolve their claims through binding arbitration because Congress expressed an intent to preclude binding arbitration when it enacted the MMWA. The FAA does not supersede the MMWA. Because of our resolution of this case, we need not address the parties' dispute over the single document rule.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 20, 2001, William Lobach went to the Koons Ford dealership on Security Boulevard in Baltimore, Maryland, with the intention of purchasing a vehicle. William's father, Raymond Lobach, accompanied William to the dealership. A sales representative presented William and Raymond with a 2001 Ford Escort, which William ultimately purchased. Raymond was a co-signer on the purchase. As part of the transaction, William and Raymond signed several documents, including a double-sided buyer's order; both men signed both sides of the buyer's order. The reverse side of the buyer's order contained the following provision:

10. WE AGREE THAT ANY CLAIM, DISPUTE OR CONTROVERSY DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR TO ANY VEHICLE INVOLVED HEREIN SHALL BE RESOLVED BY BINDING ARBITRATION THROUGH THE NATIONAL

ARBITRATION FORUM, UNDER ITS CODE OF PROCEDURE THEN IN EFFECT. RULES AND FORMS OF THE NATIONAL ARBITRATION FORUM MAY BE OBTAINED AND ALL CLAIMS SHALL BE FILED AT ANY NATIONAL ARBITRATION FORUM OFFICE, *www.arb-forum.com* OR PO BOX 50191, MINNEAPOLIS, MINNESOTA 55405. THIS AGREEMENT IS MADE PURSUANT TO A TRANSACTION INVOLVING INTERSTATE COMMERCE, AND SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. SECTIONS 1–16. JUDGMENT UPON ANY AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE PARTIES ACKNOWLEDGE THAT THEY HAVE KNOWINGLY WAIVED THEIR RIGHTS TO A JUDGE OR JURY TRIAL. NOTHING HEREIN SHALL BE CONSTRUED TO PREVENT EITHER PARTY'S USE OF REPOSESSION, REPLEVIN, DETINUE OR ANY OTHER REMEDY, WITH OR WITHOUT JUDICIAL PROCESS, CONCERNING ANY COLLATERAL, SECURITY OR PROPERTY INTEREST RELATING TO THIS AGREEMENT, NOR SHALL ANYTHING HEREIN BE CONSTRUED TO LIMIT ANY REMEDIES UNDER THE MARYLAND AUTOMOTIVE WARRANTY ENFORCEMENT ACT, OR THE MAGNUSON MOSS ACT.

On April 20, 2005, Raymond, individually, and as next of kin to William,[1] filed a complaint in the Circuit Court for Baltimore County against Koons Ford. According to the complaint, after taking possession of the Ford Escort, the buyers discovered defects in, and undisclosed prior damage to, the vehicle; specifically, water began leaking into the interior of the car and into the trunk. The complaint alleged violation of the MMWA (Count I),[2] violation of the Maryland Consumer Protection Act ("MCPA") § 13–301(1) (Count II), violation of the

---

1. William is now deceased.

2. Raymond alleged that Koons Ford violated the MMWA, the main issue now before this Court, by selling the vehicle in breach of the

MCPA § 13–301(9) (Count III), breach of contract (Count IV), violation of the Maryland Commercial Law Code § 12–1005 (Count V), fraud (Count VI), and a derivative action against Suntrust Bank for all of the aforementioned claims (Count VII). On June 3, 2005, Koons Ford filed a Petition for Order to Arbitrate and Dismissal of Complaint, requesting that the Circuit Court stay the case so that the claims could be submitted to arbitration pursuant to the provisions in the buyer's order.

A motions hearing was held on August 26, 2005, and the Circuit Court denied Koons. Ford's petition without prejudice.[3] On September 26, 2005, Koons Ford filed an Amended Petition for Order to Arbitrate and Dismissal of Complaint, with an attached affidavit, requesting the same relief as the original petition. On March 10, 2006, the Circuit Court granted Koons Ford's Amended Petition for Order to Arbitrate as to Counts II through VI, and denied it with respect to Count I.[4] On April

---

implied and express warranties of merchantability and fitness. A sales representative and finance department representative at Koons Ford had both "affirmatively represented that the [a]utomobile did not have any prior damage." In addition, Koons Ford presented Raymond and William with a Used Vehicle Disclosure Form, in which it stated that the vehicle had never been used for commercial use. Raymond and William materially relied upon these assurances when purchasing the vehicle. A diagnostic evaluation of the vehicle, however, revealed that the vehicle had prior accident damage, which damaged the frame and caused it to leak. A service technician also informed Raymond that the odometer had been rolled back and that the car had other mechanical problems. The vehicle also had prior commercial use as a lease and rental vehicle. Accordingly, Raymond argues that the vehicle is unfit for ordinary purposes, that Koons Ford acted with actual malice and evil intent, and that Raymond continues to suffer harm as a result of Koons Ford's actions. This harm includes the increased interest and finance charges as a result of the inflated sales price, loss of use of the vehicle, and the money paid for repairs to the vehicle.

3. Koons Ford failed to attach an affidavit to its Petition For Order to Arbitrate. The court denied the Petition "without prejudice with the right to re-bring it, as it [wa]s not supported, the [c]ourt [wa]s not going to consider it."

4. On April 5, 2006, Raymond Lobach filed a First Amended Complaint in this action. It contained only the MMWA count (originally Count I), and removed William Lobach as a plaintiff.

10, 2006, Koons Ford filed its Notice of Appeal to the Court of Special Appeals.[5]   On September 13, 2006, while the appeal was pending in the intermediate appellate court, this Court issued a writ of certiorari on its own motion. *Koons Ford v. Lobach*, 394 Md. 478, 906 A.2d 942 (2006).

## DISCUSSION

Koons Ford contends that under the FAA, arbitration agreements are enforceable absent a showing that Congress intended to override the FAA by precluding binding arbitration for claims arising under a particular statute.   Koons Fords explains that under the test articulated in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185, 194 (1987), the congressional intent " 'will be deducible from [the statute's] text or legislative history' or from an 'inherent conflict between arbitration and the statute's underlying purposes.' " Koons Ford contends (1) that neither the text nor legislative history of the MMWA indicates that Congress intended to

---

**5.**  Koons Ford presented the following questions in its brief on appeal:
   1.  May claims under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq., be resolved through binding arbitration?
   2.  Does the failure to include an arbitration clause in the warranty document preclude binding arbitration of claims under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq., when a valid arbitration provision is included in a related document?
Raymond Lobach presented the following questions in his brief on appeal:
   I.   Whether courts should compel binding arbitration when consumers do not have any *true* notice or knowledge that they have entered into contracts that include a binding arbitration provision?
   II.   Whether the "[single] document" rule bars Koons from compelling binding arbitration of the Lobach's claims?
   III.   Whether in drafting the Magnuson–Moss Warranty Act (MMWA) it was the intent of Congress to prohibit binding arbitration?
   IV.   Whether in evaluating the FTC's implementing regulations, the courts should apply the "unreasonable interpretation" or "arbitrary or capricious" standard of review?
   V.   Whether the FTC regulations that prohibit binding arbitration of MMWA claims are unreasonable or arbitrary and capricious?
   VI.   Whether the trial court committed error in ruling that the Lobach's MMWA claims could not be resolved through binding arbitration?

preclude binding arbitration, (2) that the MMWA explicitly allows informal dispute settlement procedures but that there is no mention that Congress intended binding arbitration to be considered an informal dispute settlement mechanism, (3) that binding arbitration does not conflict with the purposes of the MMWA because enforcement of a binding arbitration clause "would have no effect on the ability of a consumer to vindicate his or her substantive rights under the MMWA," (4) that there exist several cases to support this proposition, and (5) that the regulations, promulgated by the FTC pursuant to the MMWA, stating that any informal dispute settlement mechanism must not be binding, is unreasonable "because it relies on a conclusion, rejected by many courts, that binding arbitration is considered an informal dispute settlement mechanism." [6]

In addition, Koons Ford argues that under the single document rule, a warrantor is required to include certain disclosures pertaining to a warranty in one document but that the FTC regulations make no mention of the inclusion of binding arbitration clauses in that one document. Instead, according to Koons Ford, the regulations require that the warranty document contain "[i]nformation respecting the availability of any informal dispute settlement mechanism" and binding arbitration is not an informal dispute settlement mechanism.

Raymond counters that the Circuit Court correctly denied arbitration of the MMWA claims. First, Raymond argues that no valid arbitration agreement exists since neither he nor William had notice or knowledge of the binding arbitration provision because they did not understand that they were forgoing their day in court; the buyer's order was, in their view, a contract of adhesion. Raymond next contends that both the text and legislative history of the MMWA "evince Congress's intent to preserve the rights of consumers to seek

---

**6.** Koons Ford cites *Walton v. Rose Mobile Homes LLC,* 298 F.3d 470 (5th Cir.2002), *Davis v. Southern Energy Homes, Inc.,* 305 F.3d 1268 (11th Cir.2002) and other federal cases for support. We discuss these cases *infra.*

judicial redress on warranty claims" and therefore ban binding arbitration of claims under the MMWA.

Furthermore, according to Raymond, because Congress intended to preclude a waiver of judicial remedies, the FAA is inapplicable to MMWA claims and the presumption of arbitrability is overridden. Raymond notes that although the MMWA does not explicitly mention the words "binding arbitration," at the time of the MMWA's passage, binding arbitration was not widely used in consumer contracts so there was no need at the time for Congress to expressly identify it. In addition, Raymond states that "it is not at all clear that arbitration was perceived as a 'formal' dispute resolution mechanism at the time of its enactment in 1974 ... [and] the modern view of arbitration cannot be used to glean Congress's intent in enacting the MMWA more than thirty years ago when binding arbitration was considered much different." Further, Raymond avers that the FAA was not as broadly applicable at the time of the MMWA's enactment; the Supreme Court subsequently extended the meaning of the FAA. Raymond also posits that there exists an inherent conflict between binding arbitration and the underlying principles of the MMWA because the MMWA seeks to protect consumers. As such, Raymond argues that courts should not circumvent the right of consumers to take their MMWA claims to court. Raymond also argues that those courts that have compelled arbitration of MMWA claims have wrongly excluded binding arbitration from the MMWA's definition of an "informal dispute resolution mechanism" and also do not afford the FTC regulations the weight to which they are entitled. Raymond explains that the FTC has interpreted the MMWA to preclude the enforcement of binding arbitration clauses in written warranties covered by the MMWA and that this preclusion is not arbitrary or capricious and is reasonable. Lastly, Raymond argues that the single document rule bars Koons Ford from compelling arbitration of the claims because Koons Ford included the arbitration clause on the reverse side of a buyer's order, and not on the warranty itself, as is required by that rule.

### Basic Contract Principles

At the outset, we reject Raymond's claim that neither he nor William had notice or knowledge of the binding arbitration provision or that they were forgoing their ability to bring a civil suit because the buyer's order constitutes a contract of adhesion. The pertinent portion of the provision on the buyer's order stated: "WE AGREE THAT ANY CLAIM, DISPUTE OR CONTROVERSY DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR TO ANY VEHICLE INVOLVED HEREIN SHALL BE RESOLVED BY BINDING ARBITRATION.... THE PARTIES ACKNOWLEDGE THAT THEY HAVE KNOWINGLY WAIVED THEIR RIGHTS TO A JUDGE OR JURY TRIAL." The applicable language was clear and comprehensible and appeared in the buyer's order in capital letters and in bold print. Moreover, both Raymond and William signed their names below the arbitration provision, attesting to their understanding of what they had read. We hold that Raymond and William may not evade their obligations simply because they chose to not read what they had signed.

This conclusion is consistent with the precedent of this Court. We explained recently in *Holloman v. Circuit City Stores, Inc.,* 391 Md. 580, 595, 894 A.2d 547, 556 (2006), that "under Maryland law, a party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution." In addition, in *Walther v. Sovereign Bank,* 386 Md. 412, 444, 872 A.2d 735, 754 (2005), we stated that

> [i]f petitioners did not [read the agreement] before they signed the agreement, they have no person to blame but themselves. As expressed earlier in our discussion, we are loath to rescind a conspicuous agreement that was signed by a party whom now, for whatever reason, does not desire to fulfill that agreement.

This principle is not a new principle; it has been long echoed in this Court. In *Binder v. Benson,* 225 Md. 456, 461, 171 A.2d 248, 250 (1961), we explained that

[i]t is true that the usual rule is that if there is no fraud, duress or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or, without reading it or having it read to him, signs it, is bound by his signature as to all of its terms.

Raymond has not alleged fraud, duress, or mutual mistake in this case. Nor has he alleged that he or William lacked the capacity to understand the written buyer's order that both of them signed. He simply contends that he and William are not bound by their signatures. We disagree.

Another provision of the buyer's order provides in relevant part, "NOR SHALL ANYTHING HEREIN BE CONSTRUED TO LIMIT ANY REMEDIES UNDER ... THE MAGNUSON MOSS ACT." We follow the objective law of contract interpretation. *Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645, 653 (2001). In *Gen. Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985), we said:

A court construing an agreement under this [objective] test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

We interpret the above referenced contract provision, by its terms, to mean that claims filed under the MMWA are exempt from the restrictive provisions of the buyer's order. Thus, as a reasonable interpretation of the contract between the parties, Raymond may not be precluded from pursuing his claims

for breach of warranty in a court of law. Our analysis does not stop here. Even though we think the MMWA allows for non-binding, as opposed to binding arbitration, we must determine whether the FAA trumps the MMWA and whether the binding arbitration provision contained in the buyer's order is nonetheless enforceable.

## Evolution of The Federal Arbitration Act

The issues now before us involve the interplay between two Federal statutes, the FAA and the MMWA. We must therefore examine the FAA, to determine whether, and to what extent, that statute affects our analysis of the MMWA. The FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Congress enacted the FAA in 1925 "[t]o make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." United States Arbitration Act, ch. 213, 68 P.L. 401, 43 Stat. 883 (1925).

Prior to the 1980s, the FAA was widely inapplicable to claims that were based upon the assertion of statutory, rather than contractual, claims. For example, in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court analyzed whether a conflict existed between the FAA and the Securities Act of 1933 to determine whether an agreement to arbitrate issues arising under the Securities Act was valid. The Supreme Court evaluated both statutes and stated: "Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controver-

sies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the [Securities] Act." *Wilko*, 346 U.S. at 438, 74 S.Ct. at 188–89, 98 L.Ed. at 177. The Court held that the arbitration provision in the parties' agreements was void under the Securities Act because the arbitration provision deprived Petitioner of his rights and forced him to surrender the advantages that the Securities Act gave him as the buyer in the transaction. *See also NLRB v. Radio & Television Broad. Eng'rs Union*, 364 U.S. 573, 581–82, 81 S.Ct. 330, 336, 5 L.Ed.2d 302, 309 (1961) (concluding that Congress expressed a clear preference for a Board to resolve NLRB claims, as opposed to resolution by compelled arbitration, and that, therefore, the Court must respect this policy preference).

In the 1980s, the Supreme Court began to take a different approach, giving more weight to the FAA and looking more favorably upon compelled arbitration. In 1983, in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983), the Court stated that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." In 1985, in *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242–43, 84 L.Ed.2d 158, 165, the Court echoed its prior position, concluding that "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." Also in 1985, in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the Supreme Court made clear that the FAA's mandate of arbitration also applied to causes of action created by statute.

The Supreme Court has since been reluctant to find that a statute's purpose conflicts with arbitration because it has determined that Congress enacted the FAA to "establish[] a 'federal policy favoring arbitration'" and further that "[t]he Act was intended to 'revers[e] centuries of judicial hostility to arbitration agreements,' by 'plac[ing] arbitration agreements' upon the same footing as other contracts." *McMahon,* 482 U.S. at 225–26, 107 S.Ct. at 2337, 96 L.Ed.2d. at 193 (citations omitted). In *McMahon,* the Supreme Court held that to defeat application of the FAA, the moving party "must demonstrate that Congress intended to make an exception to the [FAA] for claims arising under [a competing statute] . . . an intention discernible from the text, history, or purposes of the statute." *McMahon,* 482 U.S. at 227, 107 S.Ct. at 2338, 96 L.Ed.2d. at 194. This test has become commonly known as the *McMahon* test. The Supreme Court has utilized this test to determine whether other statutes preclude binding arbitration and supersede the FAA; the Court has strongly favored arbitration. The Supreme Court recently stated that "even claims arising under a statute designed to further important social policies may be arbitrated because 'so long as the prospective litigant effectively may vindicate his statutory cause of action in the arbitral forum, the statute serves its function.'" *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 521, 148 L.Ed.2d 373, 383 (2000) (citations omitted). The Supreme Court has not yet specifically applied this line of reasoning to the MMWA.

In addition, prior to 1984, when the Supreme Court decided *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), the FAA was considered by many courts and commentators to be only procedural in nature and applicable only in federal courts. It allowed a party to a written arbitration agreement involving either interstate commerce or a maritime transaction to enforce that agreement in federal court, so long as that court had jurisdiction. In *Southland,* the Supreme Court determined that the FAA "rests on the authority of Congress to enact substantive rules under the Commerce Clause," and that, as a result, it was enforceable in

state courts, as well as federal courts, under the Supremacy Clause. *Southland,* 465 U.S. at 11, 104 S.Ct. at 858, 79 L.Ed.2d at 12. Justice O'Connor dissented, arguing that Congress enacted the FAA pursuant to its power over the federal courts, and not the Commerce power, and that the legislative history of the FAA makes clear that Congress intended the FAA to be procedural in nature, and applicable only in federal courts. *Southland,* 465 U.S. at 11, 104 S.Ct. at 858, 79 L.Ed.2d at 12 (O'Connor, J., dissenting). The House report upon which she relied states, in pertinent part:

> The matter is properly the subject of [f]ederal action. Whether an agreement for arbitration shall be enforced or not is a *question of procedure* to be determined by the law court in which the proceeding is brought and not one of substantive law to be determined by the law of the forum in which the contract is made. Before such contracts could be enforced in the *[f]ederal courts,* therefore, this law is essential.

H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924) (emphasis added).

### The Magnuson–Moss Warranty Act

██ Congress enacted the MMWA in 1975 "[t]o provide minimum disclosure standards for written consumer product warranties; to define minimum Federal content standards for such warranties; to amend the Federal Trade Commission Act in order to improve its consumer protection activities; and for other purposes." Magnuson–Moss Warranty Act, 93 P.L. 637, 88 Stat. 2183 (1975). Congress also intended the MMWA to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 U.S.C. § 2302(a). In furtherance of these goals, § 2310(d)(1) of the MMWA gives consumers a statutory private right of action, in either state or federal court, if they are "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title [15 U.S.C. § 2310 et. seq.], or under a written warranty, implied warranty, or service contract. . . ."

The main provision of the MMWA, 15 U.S.C. § 2310, entitled "Remedies in consumer disputes" states, in pertinent part:

(a) Informal dispute settlement procedures; establishment; rules setting forth minimum requirements; effect of compliance by warrantor; review of informal procedures or implementation by Commission; application to existing informal procedures.

(1) Congress hereby declares it to be its policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.

(2) The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this title [15 USCS §§ 2301 et seq.] applies. Such rules shall provide for participation in such procedure by independent or governmental entities.

(3) One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

(A) a warrantor establishes such a procedure,

(B) such procedure, and its implementation, meets the requirements of such rules, and

(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class

action with respect to a warranty obligation) initially resort to such procedure.

\* \* \* \*

(4) The Commission on its own initiative may, or upon written complaint filed by any interested person shall, review the bona fide operation of any dispute settlement procedure resort to which is stated in a written warranty to be a prerequisite to pursuing a legal remedy under this section. If the Commission finds that such procedure or its implementation fails to comply with the requirements of the rules under paragraph (2), the Commission may take appropriate remedial action under any authority it may have under this title [15 USCS §§ 2301 et seq.] or any other provision of law.

(5) Until rules under paragraph (2) take effect, this subsection shall not affect the validity of any informal dispute settlement procedure respecting consumer warranties, but in any action under subsection (d), the court may invalidate any such procedure if it finds that such procedure is unfair.

To encourage settlement of disputes in a manner other than by civil lawsuits, the MMWA allows warrantors to include a provision for an "informal dispute settlement procedure" for breach of warranty claims and to mandate that consumers resort to such a procedure before bringing their case to court. 15 U.S.C. § 2310(a). Congress never defined "informal dispute settlement procedure" but it left the power to the FTC to devise minimum requirements for any informal dispute settlement procedure incorporated into the written warranty.

In response, the FTC promulgated regulations setting forth what must be contained in a written warranty's terms, in addition to how the informal dispute settlement procedures shall work. In 16 C.F.R. § 703.1, the FTC defines "Mechanism" as "an informal dispute settlement procedure which is incorporated into the terms of a written warranty. . . ." In 16 C.F.R. 703.5, the FTC explains how the Mechanism will operate and states explicitly that "[d]ecisions of the Mecha-

nism shall not be legally binding on any person. . . ." *See also* 40 Fed.Reg. 60168, 60211 (1975) (stating that "[t]here is nothing in the Rule which precludes the use of any other remedies by the parties following a Mechanism decision . . . . reference within the written warranty to any binding, non-judicial remedy is prohibited by the Rule and the Act"). Therefore, according to the FTC, the MMWA does not allow for the resolution of claims through forced or binding arbitration.

The Supreme Court has stated:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute,[] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[]

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694, 702–03 (1984).

Under the test announced in *Chevron*, we must therefore determine whether Congress evinced its intent to preclude, or allow, resolution of MMWA claims through binding arbitration, and, if not, whether the FTC's interpretation is a permissible construction of the MMWA. This matter is one of first impression for this Court and one in which there exists a vast disparity of opinions among the jurisdictions in this country. As stated above, the Supreme Court has not yet addressed this issue and, at the current time, only two federal appeals

courts, the United States Courts of Appeal for the Fifth and Eleventh Circuits, have addressed this issue. The various federal and state courts throughout this country remain divided.

As Koons Ford sets forth, the United States Court of Appeals for both the Fifth and Eleventh Circuits have held that MMWA claims are subject to binding arbitration, based on the *McMahon* factors mentioned *supra*. *See Walton v. Rose Mobile Homes LLC*, 298 F.3d 470 (5th Cir.2002); *Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268 (11th Cir. 2002). The court in *Walton* examined the text of the MMWA, its legislative history, and whether arbitration conflicted with the MMWA's purpose, in accordance with *McMahon*, and concluded that "the text, legislative history, and purposes of the MMWA do not evince a congressional intent to bar arbitration of MMWA written warranty claims." *Walton*, 298 F.3d at 478. In examining the MMWA's text, that court stated that it "does not specifically address binding arbitration, nor does it specifically allow the FTC to decide whether to permit or to ban binding arbitration." *Walton*, 298 F.3d at 475. As to the legislative history, the court held that it "does not specifically discuss the availability of arbitration, nor does it define or shed light on the meaning of 'informal dispute settlement procedure.'" *Walton*, 298 F.3d at 476. Notwithstanding, the *Walton* court determined that under the MMWA, when a warrantor creates an informal dispute settlement procedure, the warrantor is permitted to include language in the warranty that would require a consumer to resort to this settlement procedure before pursuing a legal remedy; "[y]et binding arbitration generally is understood to be a *substitute* for filing a lawsuit, not a prerequisite." *Walton*, 298 F.3d at 475. The court therefore concluded that binding arbitration falls "outside the bounds of the MMWA and of the FTC's power to prescribe regulations." *Walton*, 298 F.3d at 476. Lastly, the court examined the MMWA's purposes and determined that there did not exist "any inherent conflict between arbitration and these purposes. Consumers can still vindicate their rights under warranties in an arbitral forum.

Warranties can provide adequate and truthful information to consumers, while also requiring binding arbitration. Arbitration is not inherently unfair to consumers." *Walton*, 298 F.3d at 478.

Similarly, the court in *Davis* determined that neither the text nor legislative history of the MMWA expressly prohibited binding arbitration and further concluded that the purpose of the MMWA did not conflict with the FAA. *Davis*, 305 F.3d at 1274–77. The court next examined the FTC regulations and concluded that the FTC's position that it would not develop guidelines that would require consumers to commit themselves "to resolve any difficulties in a binding, but non-judicial, proceeding" was "unreasonable." The court stated that "this interpretation is no longer valid based on the Supreme Court's abandonment of its hostile attitude towards arbitration. In light of the Supreme Court's acknowledgment and continual enforcement of the strong federal policy toward arbitration, we conclude this rationale to be based on an impermissible construction of the statute." *Davis*, 305 F.3d at 1280. *Davis* further determined that arbitration did not constitute an informal dispute mechanism because the FTC defined such a mechanism as "only a precursor to litigation and never binding" and binding arbitration is understood generally to be a substitute for litigation. Davis, 305 F.3d at 1274. The court therefore held that "[a]fter a thorough review of the MMWA and the FAA, combined with the strong federal policy favoring arbitration, we hold that written warranty claims arising under the Magnuson–Moss Warranty Act may be subject to valid binding arbitration agreements."[7] *Davis*, 305 F.3d at 1280.

Conversely, there exists support for Raymond's contention that the MMWA constitutes an exception to the FAA and, therefore, claimants cannot be forced to resolve their claims

---

**7.** We also acknowledge that this conclusion has been echoed in several other jurisdictions. *See, e.g. Dombrowski v. General Motors Corp.*, 318 F.Supp.2d 850, 851 n. 1 (D.Ariz.2004); *Stacy David, Inc. v. Consuegra*, 845 So.2d 303, 306 (Fla.Dist.Ct.App.2003); *Daimler Chrysler Corp. v. Yaeger*, 818 N.E.2d 527, 534 (Ind.Ct.App.2004).

through binding arbitration. Chief Judge King dissented in *Walton* to espouse this view. He examined the congressional intent at the time of the MMWA's enactment and determined that the congressional intent was unclear as to binding arbitration—that Congress did not speak directly to the issue before us today. He explained, however, that he was not surprised about the lack of discussion since the Supreme Court expanded the FAA after the MMWA was written and it is therefore more broadly applicable today. In reviewing the FTC regulations, Chief Judge King determined that "the FTC's construction of the statute is eminently reasonable," and therefore that forced, binding arbitration is impermissible under the MMWA. *Walton,* 298 F.3d at 492 (King, C.J.dissenting). He therefore concluded that the District Court's judgment refusing to compel arbitration of the claims was correct. *Id.*

Other courts also oppose *Walton* and *Davis* and support Raymond's contentions. For example, the United States District Court for the Northern District of Ohio in *Rickard v. Teynor's Homes, Inc.,* 279 F.Supp.2d 910, 921 (N.D.Ohio 2003), agreed with the *Walton* dissent's reasoning, and explained that "the creators of the FAA understood that arbitration agreements historically were entered into in the commercial or contractual context where the parties were sophisticated and deliberately desired to avoid the expense and delay attendant on the civil trial system," and that it was the Supreme Court that later decided to expand the scope of the FAA beyond that anticipated by Congress at the time of the MMWA's enactment.[8] That court continued,

---

8.  In support, that court cites several journal articles:

     *See e.g.,* Larry J. Pittman, The Federal Arbitration Act: The Supreme Court's Erroneous Statutory Interpretation, Stare Decisis, and a Proposal for Change 53 Ala. L.Rev. 789, 829 (2002) (finding that the drafters and supporters of the FAA envisioned that "the FAA should apply only to arbitration agreements between merchants who have freely entered into such agreements, and that the FAA does not apply to adhesion arbitration agreements between powerful sellers and weak buyers"); Sen. Russell D. Feingold, Policy Essay: Mandatory Arbitration: What Process is Due? 39 Harv. J. on Legis. 281, 289

"notwithstanding the Supreme Court's recent expansion of the FAA, the statute's 'liberal policy' should not encroach on or undermine the manifest pro-consumer policy of the MMWA" and concluded that the MMWA precludes the enforcement of binding arbitration agreements for claims under written warranties, because of the FTC regulations. *Rickard*, 279 F.Supp.2d at 921.

The court in *Browne v. Kline Tysons Imports, Inc.*, 190 F.Supp.2d 827 (E.D.Va.2002), went further, finding that Congress intended to preclude binding arbitration for claims under the MMWA, in addition to the FTC's regulations precluding binding arbitration. That court stated: "A clear reading of the statute evinces Congress's intent to encourage informal dispute settlement mechanisms, yet not deprive any party of [his or her] right to have [a] written warranty dispute adjudicated in a judicial forum." *Browne*, 190 F.Supp.2d at 831. The court therefore determined that, under the MMWA, "[a]ny informal dispute settlement procedure that may be utilized to resolve written warranty disputes under the MMWA must be a non-binding mechanism, which serves as a prerequisite, and not a bar, to relief in court." *Id.* The *Browne* court also held that the FTC regulations further demonstrate that the MMWA prohibits binding arbitration of claims.[9]

---

(stating that Congress did not originally intend "the FAA to enable stronger parties to force weaker parties into binding arbitration"); Jean R. Sternlight, Panacea or Corporate Tool? Debunking the Supreme Court's Preference for Binding Arbitration 74 Wash. U.L.Q. 637, 647 (1996) ("Most commentators have concluded that the FAA was envisioned as applying to consensual transactions between two merchants of roughly equal bargaining power, and not necessarily to transactions between a large merchant and a much weaker and less knowledgeable consumer."). Rickard, 279 F.Supp.2d at 921 n. 12.

**9.** *See also Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F.Supp.2d 958, 962–65 (W.D.Va.2000) (finding that the MMWA and FTC's regulations preclude binding arbitration). Although *Rickard, Browne,* and *Pitchford* are the decisions of *nisi prius* courts, we mention those cases because their analysis is persuasive and consistent, at least in part, with our own interpretation of the MMWA.

We reject Koons Ford's interpretation of the MMWA. In addressing the first prong of the *Chevron* test, we agree with Raymond, and the *Browne* court, that Congress expressed an intent to preclude binding arbitration of claims under the MMWA, a conclusion which is further supported by the FTC regulations. As *Walton* and *Davis* explain, binding arbitration is no longer a precursor to litigation but is, instead, a substitute for litigation. *Walton*, 298 F.3d at 475 (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); *Davis*, 305 F.3d at 1274. *Davis* and *Walton* use this distinction to conclude that Congress must not have addressed whether binding arbitration clauses are enforceable and, therefore, the FAA must control. Notwithstanding the support for Koons Ford's position, we are not convinced that these cases are dispositive because they are all based upon *McMahon* and the Supreme Court's interpretation, and expansion, of the FAA nearly a decade *after* the MMWA was enacted.

### Congress's Intent to Preclude Binding Arbitration

To determine whether Congress addressed the issue now before us, we must evaluate the plain language of the text of the MMWA to ascertain the congressional intent at the time that Congress enacted the statute. *See Walzer v. Osborne*, 395 Md. 563, 571–74, 911 A.2d 427, 431–34 (2006) (outlining the rules of statutory interpretation); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454–55, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377, 392 (1989) (explaining that the plain language of a statute is ordinarily the most reliable source for interpreting the meaning of a statute and that looking beyond the plain language becomes permissible only in situations where the plain meaning seems inconsistent with the congressional intent). Based on the clear language of the MMWA, we conclude that Congress expressed an intent to preclude the enforcement of binding arbitration clauses under the MMWA.[10]

---

10. We acknowledge that Congress did not include in the text of the MMWA any language expressly identifying "binding arbitration," as

Congress made clear, in § 2310(a)(3)(C), that consumers must retain the ability to adjudicate their claims in court, even if they must first resort to informal dispute settlement procedures. Congress explained that consumers may be required to participate in the informal dispute settlement mechanisms established by warrantors *before* pursuing other legal remedies. Congress stated explicitly that a consumer may be forced to submit to an informal dispute resolution mechanism *"before* pursuing any legal remedy under this section respecting such warranty" (emphasis added). The language of 15 U.S.C. § 2310 therefore makes clear that the warrantor may establish "informal dispute settlement mechanisms" that consumers must use to resolve their claims under the MMWA, but that consumers cannot be forced to resolve their claims through an informal dispute resolution mechanism that is binding. Consumers may be required by warrantors to participate in a non-binding informal dispute settlement mecha-

---

Koons Ford sets forth. Notwithstanding this acknowledgment, we do not conclude that the lack of such language means that Congress did not speak directly to the issue at hand; there existed no reason for Congress to include such language in 1975. Neither *McMahon* nor the cases discussed *supra,* in which the Supreme Court expanded the applicability of the FAA, had been decided in 1975 when Congress enacted the MMWA. Therefore, when Congress discussed informal dispute settlement mechanisms, it was doing so based on the law at that time; in 1975 the FAA was not as broadly applicable and arbitration was not as formal. Binding arbitration would not become an issue for Congress until the mid 1980's when the Supreme Court decided that the FAA was more broadly applicable and arbitration became a substitute for litigation. *See Walton,* 298 F.3d at 484 (King, C.J.dissenting) (stating that "the formality of arbitration proceedings have increased notably in the latter half of the twentieth century, particularly in the period since the Supreme Court 'revitalized' the FAA by clarifying its applicability to statutory claims in the late 1980s").

Furthermore, as stated *supra,* prior to 1984, many courts and commentators believed that the FAA applied only to federal cases. Given that in diversity cases, there must be diversity of citizenship and a significant amount in controversy, the FAA would not have applied to very many warranty disputes, like the one at issue here, and therefore would not have been a concern for Congress when it enacted the MMWA. Under *Southland,* however, because of the impediments to diversity jurisdiction, most consumer contract cases involving the FAA now arise only in state courts. Congress could not have contemplated this change in 1975, when it enacted the MMWA.

nism, but only as a prerequisite; afterwards, consumers may pursue other legal remedies. 15 U.S.C. § 23 10(a)(3)(C).

Furthermore, the legislative history of the MMWA also reveals the congressional intent to prevent consumers from being forced into binding arbitration because such a resolution would constitute a substitute for litigation. The House Report on the MMWA states expressly that "[a]n adverse decision in any informal dispute settlement procedure would not be a bar to a civil action on the warranty involved in the proceedings...." H.R.Rep. No. 93–1107 (1974). Moreover, the Conference Committee Report explains that consumers can still pursue "all alternative avenues of redress" if they choose not to participate in an informal dispute settlement procedure. S. Conf. Rep. No. 93–1408 (1974).

We agree with *Davis* and *Walton* that because binding arbitration is now considered a substitute for litigation, it would not fit within Congress's definition of an informal dispute settlement mechanism that would precede other legal avenues. Notwithstanding this determination, we do not agree with *Davis* or the *Walton* majority's conclusion that Congress must therefore not have intended to preclude binding arbitration. If Congress had enacted the MMWA in the 1990s, then such a conclusion could be permissible, but it was written prior to the expansion of the FAA, in 1975. We therefore interpret the language contained in the MMWA and the language in the House and Senate reports as clear evidence of Congress's intent to protect consumers from the forced resolution of claims through binding arbitration, as it exists today as a substitute for litigation. The MM WA is pro-consumer, it seeks to protect consumers from deception, it gives consumers a statutory private right of action in state or federal court if they are damaged by the failure of a supplier, warrantor, or service contractor, and, although Congress allows for the resolution of claims through informal dispute settlement mechanisms, it stated clearly that those mechanisms precede the other legal remedies provided for under the MMWA.

When Congress enacted the MMWA, *Wilko* was the precedent, and the Supreme Court determined in *Wilko* that the claimants could not be forced to arbitrate their claims, despite the existence of the FAA, because arbitration would disadvantage the consumer. *Wilko*, 346 U.S. at 438, 74 S.Ct. at 188–89, 98 L.Ed. at 177. In addition, Raymond's contention in his brief is therefore correct—that "[w]hat was once an informal means of dispute resolution has now become more formal. Thus, the modern view of arbitration cannot be used to glean Congress's intent in enacting the MMWA more than thirty years ago when binding arbitration was considered something much different." Because arbitration was a precursor to litigation in 1975 and the precedent at the time that Congress enacted the MMWA was that arbitration disadvantaged the consumer, we hold that Congress did not intend for consumers to be forced to resolve their MMWA claims through binding arbitration, as it stands today. Congress likely intended to include arbitration, as it existed in 1975, as an informal dispute settlement procedure because consumers could still pursue a civil action. It is clear, however, that Congress intended to preclude arbitration in its current form, based on the language in § 2310(a).

■ "In construing a statute, '[w]e avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.'" *Walzer*, 395 Md. at 573, 911 A.2d at 432 (2006) (citing *Blake v. State*, 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006)); *see also Gwin v. MVA*, 385 Md. 440, 462, 869 A.2d 822, 835 (2005); *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994). It would be inconsistent with common sense, and the MMWA's pro-consumer approach, to hold that Congress intended for consumers to retain their ability to pursue a civil action, but did not intend to bar the use of binding arbitration that would constitute a substitute for litigation. We therefore reject Koons Ford's interpretation of the MMWA.

■ If Congress intended otherwise, then it certainly had, and still has, the ability to say so. As we have previously explained, however, "[i]t is not the task of the Judiciary to re-

write the Statute.... The court's charge in interpreting a statute is to determine the intent of the Legislature, not to insert language to change the meaning of a statute." *Walzer,* 395 Md. at 584–85, 911 A.2d at 439–40 (citations omitted).

Even if Congress did not directly express an intent to preclude binding arbitration in the language of the MMWA, the FTC's interpretation o f the MMWA is certainly based on a permissible construction of the MMWA. *See Walton,* 298 F.3d at 492 (King, C.J.dissenting); *Rickard,* 279 F.Supp.2d at 921; *Browne,* 190 F.Supp.2d at 831; *Pitchford,* 124 F.Supp.2d at 962–65. The FTC's interpretation is a permissible construction for all of the reasons set forth *supra,* describing why this Court believes that Congress evinced such an intent.[11] Therefore, under the second prong of the *Chevron* test, we would defer to the FTC regulations and hold that the MMWA precludes the resolution of MMWA claims through binding arbitration.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. KOONS FORD TO PAY THE COSTS.**

RAKER and HARRELL, JJ., Dissent.

Dissenting Opinion by HARRELL, J., which RAKER, J., Joins.

I dissent. While the Majority is welcome to pin its decision on the reasoning adopted previously by only three federal

---

**11.** The FTC made clear that it based its decision on the plain language of the MMWA and not other factors. In 64 Fed.Reg. 19700, 19708 (Apr. 22, 1999), the FTC stated expressly that:

The [FTC] examined the legality and the merits of mandatory binding arbitration clauses in written consumer products warranties when it promulgated Rule 703 in 1975. Although several industry representatives at that time had recommended that the Rule allow warrantors to require consumers to submit to binding arbitration, the [FTC] rejected that view as being contrary to the congressional intent. The [FTC] based this decision on its analysis of the plain view of the [MMWA].

The FTC also declined, in this volume of the Federal Register, to amend the regulations to allow for binding arbitration, stating that "this interpretation continues to be correct."

district courts,[1] a handful of law journal articles,[2] and a dissent,[3] I would choose to follow and adopt the reasoning of the other courts (the vast majority) that have decided that the Magnuson–Moss Warranty Act permits binding arbitration to be elected for disputes arising under a covered warranty. *See, e.g., Davis v. S. Energy Homes, Inc.,* 305 F.3d 1268 (11 th Cir.2002); *Walton v. Rose Mobile Homes, Inc.,* 298 F.3d 470 (5th Cir.2002); *Patriot Mfg., Inc. v. Dixon,* 399 F.Supp.2d 1298, 1306–07 (S.D.Ala.2005); *Dombrowski v. Gen. Motors Corp.,* 318 F.Supp.2d 850, 850–51 (D.Ariz.2004); *Pack v. Damon Corp.,* 320 F.Supp.2d 545, 558 (E.D.Mich.2004); *Patriot Mfg., Inc. v. Jackson,* 929 So.2d 997, 1005–06 (Ala.2005); *Daimler Chrysler Corp. v. Yaeger,* 818 N.E.2d 527, 536 (Ind. 2004); *Borowiec v. Gateway 2000,* 209 Ill.2d 376, 283 Ill.Dec. 669, 808 N.E.2d 957, 970 (2004); *Abela v. Gen. Motors Corp.,* 469 Mich. 603, 677 N.W.2d 325 (2004); *Howell v. Cappaert Manufactured Housing, Inc.,* 819 So.2d 461, 464 (La.Ct.App. 2002); *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 492 (Tex.2001); *S. Energy Homes, Inc. v. Ard,* 772 So.2d 1131, 1135 (Ala.2000).

The Majority opinion, to its credit, gives a fair (and persuasive) summary of the reasoning in *Davis* and *Walton.* *See* Maj. op. at 54–57, 919 A.2d at 732–34. I need not repeat that here. Suffice it to add that the Federal Trade Commission's anti-arbitration bias, expressed in its 1999 renewal of the view that "Section 110(a)(3) of the [Magnuson–Moss] Warranty Act ... clearly implies that a [informal dispute settlement] mechanism's decision cannot be legally binding, because if it were it would bar later court action" (64 Fed.Reg. 19700, 19708 (1999)) is completely out-of-step with both Congress' and the U.S.

---

**1.** *Rickard v. Teynor's Homes, Inc.,* 279 F.Supp.2d 910 (N.D.Ohio 2003); *Browne v. Kline Tysons Imports, Inc.,* 190 F.Supp.2d 827 (E.D.Va.2002); and *Pitchford v. Oakwood Mobile Homes, Inc.,* 124 F.Supp.2d 958 (W.D.Va.2000).

**2.** *See* Maj. op. at 54–57, n. 8, 919 A.2d at 734, n. 8.

**3.** Chief Judge King's dissent in *Walton v. Rose Mobile Homes, Inc.,* 298 F.3d 470 (5th Cir.2002).

Supreme Court's views regarding arbitration not being inherently hostile to consumers' interests. *See, e.g., Green Tree Fin. Corp.—Ala. v. Randolph,* 531 U.S. 79, 89–90, 121 S.Ct. 513, 521–22, 148 L.Ed.2d 373 (2000).

Judge RAKER authorizes me to state that she joins the views expressed in this dissent.